WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>              Plaintiff,<br><br>v.<br><br>Willard John,<br><br>              Defendant. | No. CR-12-08082-001-PCT-JAT<br><br>**ORDER** |

      Pending before the Court is Defendant Willard John's two Motions to Dismiss the Indictment (Docs. 149, 151) and one Motion to Suppress various Statements made by Defendant (Doc. 150). The Government filed Responses (Docs. 158–60), but Defendant has not replied. The Court held oral arguments and a two-day evidentiary hearing on these three motions over June 18 and 19, 2014. For the reasons stated below, Defendant's three motions are denied.

**I.    BACKGROUND**

      On the morning of March 19, 2013, Larson Williams ("Williams") discovered Willard John ("Defendant") and NJH ("Victim") lying on the bed in their bedroom in a pool of blood. First responders arrived and found Victim deceased from multiple stab and slash wounds. Defendant was found alive, but suffering from a still bleeding neck wound. Defendant was transported to hospital, underwent surgery, and survived. Later that morning, FBI Special Agent Stephen Hale ("SA Hale") arrived at the scene, interviewed various people present, and collected evidence, including two samples of the bloody

mattress Defendant and Victim were found lying upon. Later that day, SA Hale allowed Defendant's family to remove and destroy the bloody mattress.

Also on March 19, 2014, BIA Special Agent Auggie Belvado ("SA Belvado") travelled to the hospital, collected evidence from Defendant, and photographed Defendant's injuries. On March 21 and 32, 2012, SA Hale travelled to the hospital and interviewed Defendant. Defendant was later arrested on suspicion of murder and, on April 11, 2012, indicted on a single count of first degree murder. In preparation for trial, Defendant has moved to dismiss the indictment on two grounds and moved to suppress both of Defendant's statements to SA Hale.

## II.  MOTION TO DISMISS THE INDICTMENT FOR DESTRUCTION OF CRIME SCENE EVIDENCE (DOC. 149)

Defendant's first Motion to Dismiss the Indictment (Doc. 149) alleges that the Government investigators destroyed material exculpatory evidence from the crime scene—a bloody mattress—by "giving the bed away to be burned" without first recovering trace evidence from it for future DNA testing (*id.* at 1–3). Defendant further asserts (*id.* at 7–15) that this failure to preserve potential DNA evidence constitutes a due process violation and merits either dismissal of the indictment or, alternatively, a lesser sanction. In its Response, the Government argues (Doc. 159 at 8–14) that a due process violation has not occurred because the destruction of the bloody mattress does not prejudice Defendant.

### A.  Legal Standard

In *United States v. Sivilla*, 714 F.3d 1168 (9th Cir. 2013), the Court of Appeals for the Ninth Circuit articulated the applicable legal standard:

> In order for destruction of evidence to rise to the level of a constitutional violation, a party must make two showings. First, that the government acted in bad faith the presence or absence of which "turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993) (citing *Arizona v. Youngblood*, 489 U.S. 51, 56–57 (1988)). Second, that the missing evidence is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

> *California v. Trombetta*, 467 U.S. 479, 489 (1984); *Cooper*, 993 F.2d at 931. Another configuration of this test requires the showing of bad faith where the evidence is only potentially useful and not materially exculpatory. [*United States v.*] *Del Toro-Barboza*, 673 F.3d [1136, 1149 (9th Cir. 2012)]. For evidence to be materially exculpatory, its exculpatory nature must be apparent. *Id.* Under either configuration of the test, the inquiry turns on whether any exculpatory value in the [mattress] was apparent to the government agents.

*Sivilla*, 714 F.3d at 1172. Generally, evidence is material and exculpatory if it is clearly favorable to the accused, and considered in the context of the entire record, may affect the outcome of the case. *See United States v. Agurs*, 427 U.S. 97, 113–14 (1976). In contrast, "[p]otentially useful evidence" is evidence "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," such as Breathalyzer samples or seized cocaine. *Illinois v. Fisher*, 540 U.S. 544, 547–48 (2004); *Youngblood*, 488 U.S. at 57.

**B.     Analysis**

In this case, the Court held a hearing in order to fully establish and examine the relevant facts:[1]

- On the morning of March 19, 2012, Larson Williams ("Williams") (who lived in the same house as Defendant and Victim) discovered Defendant and Victim covered in blood and lying on top of a mattress in their bedroom.
- Williams called the local fire department, EMTs arrived, and they found the Victim cold and stiff. At 8:45 a.m., Victim was pronounced deceased.
- The EMTs found Defendant alive, but with a slashed throat. EMTs contained the bleeding and transported Defendant to Indian Health Services ("IHS") in Whiteriver and, later, to Summit Regional Medical Center ("SRMC") in Show Low.

---

[1] In determining these facts, the Court considered the testimony and evidence submitted by the Parties at the evidentiary hearing and the evidence submitted as attachments to the Parties' briefs. Additionally, the Court notes that it finds the testimony of SA Hale and SA Belvado fully credible.

- 3 -

- At 11:30 a.m., FBI Special Agent Stephen Hale ("SA Hale") arrived at the scene and observed that a crowd of onlookers had gathered, but were contained some distance from the residence by White Mountain Apache tribal police officers.
- SA Hale interviewed the first responders at the scene and was told, among other things, that upon arrival at the scene, a first responder witnessed a neighbor exit the residence.
- SA Hale interviewed Williams (a former police officer). Williams explained that the night before, March 18, 2012, at approximately 8:00 p.m., Williams returned home and observed the Victim and Defendant sitting quietly on a couch in a common room. Williams left the home for about one hour, returned, did not observe Victim or Defendant, left again, and did not return that night. Williams further explained that he did not hear any yelling or loud noises, and that there was fresh snow falling that night.
- Williams also told SA Hale that Williams returned at approximately 8:30 a.m., yelled a greeting, received no answer, and noticed that Victim and Defendant's bedroom door was partially ajar, despite normally being closed. Williams peered inside and discovered Victim and Defendant lying on the bed covered in blood.
- Williams continued to explain to SA Hale that he then rushed to his neighboring relatives' home and then returned to the scene with three relatives. Upon entering the bedroom, Williams and the others noticed the extensive blood on the bed and floor. William's aunt spoke to and poked Victim, but Victim did not respond. They observed Defendant lying face-up on the mattress continuing to bleed from the neck. Williams observed Defendant's flashlight, cell phone, and food stamp card lying on the floor in front of the bed. Williams then called 9-1-1.
- Williams further explained to SA Hale that Defendant and Victim had a long history of domestic disputes. Williams described Defendant as aggressive towards Victim and related a personal anecdote about a previous attempt to intervene. Additionally, Williams stated that Defendant and Victim's two children lived with

a relative because Defendant and Victim fought too much.

- During SA Hale's interviews at the scene, BIA Special Agent Auggie Belvado ("SA Belvado") travelled to IHS and spoke briefly with Defendant. At the time, SA Belvado considered Defendant a victim, not a suspect. SA Belvado claims that Defendant related only that he did not remember what had happened. SA Belvado observed extensive blood on Defendant's feet, including the soles. SA Belvado photographed and swabbed the blood and photographed Defendant's injuries.

- At approximately 1:00 p.m., SA Hale entered the bedroom where Victim was still lying, deceased, on the bed. SA Hale observed a large pool of blood around her on the bed and on the floor. SA Hale also observed blood spatter on three of the four bedroom walls. The blood evidence at the scene was contained entirely within one portion of the bedroom; SA Hale did not observe blood evidence in other parts of the home or outside the home. Additionally, SA Hale found no signs of forced entry and no unexplained footprints in the fresh snow surrounding the home.

- SA Hale directed the collection of nineteen total swabs from the various blood pools and spatter. Additionally, officers found a bloody pair of scissors between the mattresses and the wall. Officers also collected the bloody clothes of Victim and Defendant as evidence.

- SA Hale exited the residence and conducted additionally interviews. McDaniel John ("McDaniel"), Defendant's brother, lives in a house adjacent to Defendant and Victim's home. McDaniel told SA Hale that, at the request of his girlfriend who had a class with Victim at 9:00 a.m., he had checked on Defendant and Victim at approximately 8:20 a.m. that morning. McDaniel explained that he entered the house, opened the bedroom, and quickly glanced in. McDaniel stated that he did not look closely and did not notice blood, but heard a sound he assumed was Defendant snoring. McDaniel then returned to his home.

- McDaniel further explained to SA Hale that, approximately five to seven minutes later, Williams ran to McDaniel's house yelling that Defendant and Victim were

1
2
3
4
5
6

covered in blood. McDaniel returned to the bedroom and found Defendant awake and gurgling on blood in his throat. McDaniel stated it was the same sound McDaniel previously mistook for snoring. McDaniel also stated that McDaniel investigated for signs of an intruder, but found no unexplained tracks in the fresh snow or signs of forced entry.  Lastly, McDaniel related to SA Hale anecdotes about previous incidents of Defendant's domestic violence towards Victim.

7
8
9
10
11
12
13
14

- Eventually, Defendant's family members instructed Williams to take the bloody mattress and burn it.[2] Williams consulted SA Hale, and SA Hale asked to cut out a portion of the bloody mattress to preserve as evidence. Williams signed a written consent allowing SA Hale to reenter the home. SA Hale collected a sample of blood from the top of the mattress. Additionally, when SA Hale lifted the top mattress, SA Hale observed bloody fingerprints on the center of the underside. SA Hale cut out that portion of the bloody mattress. Afterwards, Williams and Defendant's family disposed of the bloody mattress.

15
16
17
18
19
20
21

- Both SA Hale and SA Belvado testified that it is not their regular practice to collect and store entire pieces of furniture, such as mattresses, and that he has not observed officers collecting entire pieces of furniture from previous investigations. Instead, their practice was to collect a sample of the piece of furniture, such as a swab of blood evidence or a cut-out. Additionally, SA Belvado explained that the officers did not have the physical capacity necessary to collect and properly store evidence as large as the bloody mattress.

22
23
24

- Both SA Hale and SA Belvado testified that they did not believe that the mattress held additional evidentiary value after it had been swabbed and the obviously relevant portion (the bloody fingerprints on the underside) had been cut out.

25

Based on these facts, the Court must determine "whether any exculpatory value in

---

[2] SA Hale testified that in his experience, it is common for tribal members to burn the possessions of their deceased loved ones. SA Hale has personally observed this tradition with regard to various evidence returned to a family at the conclusion of an investigation.

- 6 -

the [bloody mattress] was apparent to the government agents." *Sivilla*, 714 F.3d at 1172. Defendant argues that the identity of the perpetrator is at issue here. (Doc. 149 at 9–11). Consequently, Defendant argues that the bloody mattress was materially exculpatory because further examination of the bloody mattress—including vacuuming for hairs, fibers, and other trace evidence—may have identified the true attacker and eliminated Defendant as a suspect. (*Id.*). For analogy, Defendant cites to *State v. Escalante*, a 1986 Arizona state case about the preservation of DNA evidence when identity is an issue.[3] 734 P.2d 597 (Ariz. Ct. App. 1986). In *Escalante*, the prosecution stipulated that a semen stain that had not been properly preserved belonged to the perpetrator. Thus, had the semen stain been preserved and tested against Defendant's DNA, then Defendant would have either been confirmed or eliminated as a suspect. The *Escalante* court concluded that the state had a duty to "preserve evidence which might be expected to play a significant role in a suspect's defense." *Id.* at 602. The court further explained that the semen evidence at issue was such significant evidence because it "had the potential for eliminating the defendant as the perpetrator." *Id.* at 601.

Defendant's analogy to *Escalante*, however, is inapposite. In *Escalante*, the semen, had it been tested, would have conclusively determined whether or not the defendant was the attacker. 734 P.2d at 603–04. Here, by contrast, gathering additional trace evidence from the mattress could not conclusively exonerate Defendant because Defendant (and his DNA) was undisputedly present on the mattress at the scene. At best, if testable trace evidence could have been gathered,[4] and if that trace evidence belonged to another person, it would have demonstrated only that the other person was present in the bedroom at some point prior to the gathering of the trace evidence. Defendant's claim that the mattress contained useful trace evidence that would have exonerated Defendant if it had been preserved is not only purely speculative, but also illogical and untenable,

---

[3] The Court notes that as a *federal* Court sitting on a *federal* criminal matter, it is not bound by s*tate* criminal decisions.

[4] A dubious assumption given the tremendous amount of Defendant's and Victim's blood saturating the mattress and contaminating the scene.

- 7 -

given the facts presented at the evidentiary hearing.

Here, the facts demonstrate that SA Hale did not consider the mattress, as a whole, to hold any exculpatory value. Moreover, SA Hale specifically preserved both a sample of the blood coating the top of the bloody mattress and the bloody fingerprints found on its underside. Thus, the facts demonstrate that to the extent the bloody mattress held any apparent materially exculpatory value, SA Hale preserved that evidence. The Court finds that there was no obviously materially exculpatory value in the unpreserved portion of the bloody mattress. Thus, even if the Government was negligent in not preserving the remainder of the bloody mattress, Defendant must demonstrate that the government's actions rise to the level of bad faith required by *Youngblood*. 488 U.S. at 56.

Here, Defendant scantly argues bad faith by arguing that "the FBI did not simply mishandle the evidence as was the circumstance in *Escalante*, in which the State simply failed to freeze the evidence. The FBI deliberately gave the evidence away, knowing it would be destroyed." (Doc. 149 at 11). Although true that SA Hale allowed Defendant's family, at their not-unusual request, to remove the mattress and destroy it, the Court finds that this does not rise to the level of bad faith. SA Hale specifically collected a blood sample from the top of the mattress and cut-out the bloody fingerprints on the underside, thereby preserving the most relevant portions of the mattress prior to its destruction. Additionally, SA Hale credibly testified that he did not believe that the remainder of the mattress constituted potentially exculpatory evidence, in part because of the lack of evidence of an intruder and the fact that the mattress undeniably had been saturated with Defendant and Victim's blood. Defendant cites to no other fact as evidence of bad faith.

In sum, the Court finds that the facts do not support a claim that the exculpatory value of the bloody mattress at the time of its destruction was apparent to government agents or that the conduct of the government agents demonstrated bad faith. Thus, the Court concludes that the destruction of the mattress did not violate Defendant's due process rights. *See Sivilla*, 714 F.3d at 1172; *see also*, *Del Toro-Barboza*, 673 F.3d at 1150 ("[W]here evidence is routinely destroyed or lost by the government with no

knowledge that the evidence is likely exculpatory, and the evidence is later sought for testing, the destruction or loss of such evidence is not fundamentally unfair to a defendant and will not offend traditional notions of due process."). Accordingly, the Court denies Defendant's first Motion to Dismiss the Indictment (Doc. 149).

### C.     Alternative Sanctions

In the alternative, Defendant asks the Court to "suppress the additional evidence recovered in the bedroom, to include [Victim's] body, photographs of the scene, the scissors the Government claims to be the murder weapon, and all other items from the room that the Government may seek to introduce at trial." (Doc. 149 at 12). Additionally, Defendant asks that the Court provide an adverse jury instruction regarding the destruction of the bloody mattress. (*Id.* at 13–15).

In determining whether to give a remedial jury instruction, the "Court must balance 'the quality of the Government's conduct' against 'the degree of prejudice to the accused,' where the government bears the burden of justifying its conduct and the accused of demonstrating prejudice." *Sivilla*, 714 F.3d at 1173 (quoting *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979) (Kennedy, J., concurring)).

> In evaluating the quality of the government's conduct: the court should inquire whether the evidence was lost or destroyed while in its custody, whether the Government acted in disregard for the interests of the accused, whether it was negligent in failing to adhere to established and reasonable standards of care for police and prosecutorial functions, and, if the acts were deliberate, whether they were taken in good faith or with reasonable justification . . . . It is relevant also to inquire whether the government attorneys prosecuting the case have participated in the events leading to loss or destruction of the evidence, for prosecutorial action may bear upon existence of a motive to harm the accused.
>
> . . .
>
> In analyzing prejudice, the court must consider a wide number of factors including, without limitation, the centrality of the evidence to the case and its importance in establishing the elements of the crime or the motive or intent of the defendant; the probative value and reliability of the secondary or substitute evidence; the nature and probable weight of factual inferences or other demonstrations and kinds of proof allegedly lost to the accused; the probable effect on the jury from absence of the evidence, including dangers of

- 9 -

> unfounded speculation and bias that might result to the defendant if adequate presentation of the case requires explanation about the missing evidence.

*Sivilla*, 714 F.3d at 1173–74 (quoting *Loud Hawk*, 628 F.2d at 1152).

First, with regard to the "secondary" [5] evidence form the crime scene, Defendant merely points out that suppressing the various evidence "would be within [the Court's] discretion." (Doc. 149 at 12). Defendant does not even attempt to identify *any* prejudice suffered from the introduction of the "secondary" evidence that could be considered a consequence of the destruction of the bloody mattress. Accordingly, the Court denies Defendant's request that the Court suppress other evidence from the crime scene.

Second, with regard to an adverse jury instruction, SA Hale gave permission for Defendant's family to destroy the bloody mattress. This indicates that although the mattress was located within and removed from Victim's bedroom, the government had sufficient control over the crime scene at the time of removal to prevent removal and the destruction of the mattress. However, the facts do not indicate that the government acted with disregard for the rights of the accused. Rather, SA Hale specifically preserved two sections from the mattress, a sample of the bloody top and the bloody fingerprints on the underside. Although SA Hale may not have strictly followed FBI protocol, the facts indicate that SA Hale acted in good faith and with reasonable justification in acquiescing to Defendant's family's request to destroy a health and safety hazard. Thus, the Court finds the quality of the government's conduct to be, if less than ideal, still rather high.

With regard to Defendant's burden of demonstrating prejudice, Defendant merely reiterates (Doc. 149 at 14–15) his illogical and wishful speculation that perhaps some useful trace evidence could have been recovered from the unpreserved portions of the bloody mattress. When balanced against the government's conduct, the Court does not find that the destruction of the bloody mattress warrants an adverse jury instruction.

---

[5] The Court notes that Defendant's unusually broad request stretches the concept of "secondary" evidence well beyond its breaking point.

- 10 -

Accordingly, the Court denies Defendant's request for an adverse jury instruction.[6]

### III. MOTION TO DISMISS THE INDICTMENT FOR FAILURE TO PRESERVE EVIDENCE OF DEFENDANT'S INJURIES (DOC. 151)

Defendant's second Motion to Dismiss the Indictment (Doc. 151) alleges that the Government investigators destroyed material exculpatory evidence of Defendant's physical injuries by failing to preserve evidence of the injuries through photographs (*id.* at 2–4). Defendant further asserts (*id.* at 4–11) that this failure to preserve evidence constitutes a due process violation and merits either dismissal of the indictment or, alternatively, a lesser sanction. In its Response, the Government explains (Doc. 158 at 1–3) that, in fact, photographs of the Defendant's injuries were taken and have now been disclosed to Defendant. At the evidentiary hearing, Defendant's Counsel confirmed this disclosure. Because the Government, in fact, preserved the evidence at issue, the Court finds Defendant's motion moot.[7] Accordingly, the Court denies Defendant's second Motion to Dismiss the Indictment (Doc. 151).

### IV. MOTION TO SUPPRESS DEFENDANT'S STATEMENTS

From his hospital bed, Defendant provided two statements[8] to SA Hale concerning the events of March 18 and 19. Defendant's Motion to Suppress Defendant's Statements (Doc. 150) argues that both of these statements should be suppressed on two grounds: (1) SA Hale's entry into Defendant's hospital room violated Defendant's Fourth Amendment rights; and (2) Defendant's lack of competency rendered ineffective Defendant's waiver of his Fifth and Sixth Amendment *Miranda* rights.

---

[6] Because the facts ultimately presented at trial may differ from the facts underlying this ruling, Defendant may, of course, re-raise his request for an adverse jury instruction at the appropriate time. The Court will then reevaluate any claim of prejudice at trial balanced against the conduct of the Government, based upon the facts and law, in determining whether any proposed jury instruction will be given to the jury.

[7] To the extent that, at the evidentiary hearing, Defendant implied that the quality of the photographs taken and disclosed was insufficient, the Court finds this argument meritless. The Court makes no other rulings regarding the Government's alternative arguments (*see* Doc. 158 at 2–3) in favor of denying Defendant's motion.

[8] SA Hale entered Defendant's hospital room and obtained statements on March 21 and March 23, 2012.

**A.     Fourth Amendment**

Defendant alleges that because SA Hale twice entered Defendant's hospital room to obtain statements from Defendant without a search warrant, the government violated Defendant's reasonable expectations of privacy guaranteed by the Fourth Amendment. (Doc. 150 at 5–6). Apparently characterizing the two government interviews as "searches," Defendant generally cites (*id.*) to *Katz v. United States* for the long-standing proposition that an unreasonable search occurs when the intrusion violates both the subject's subjective and society's objective expectations of privacy. 389 U.S. 347 (1967). Next, Defendant explains that Defendant had a reasonable expectation of privacy[9] because Defendant was resting in a private hospital room in a private hospital (SRMC). (*Id.* at 6). As reinforcement of Defendant's reasonable expectations of privacy, Defendant points to SRMC's privacy policy governing hospital employee disclosures to law enforcement and SRMC security's intent to protect Defendant from recrimination by controling visitors to Defendant's room.[10]

Defendant's reliance on a general concept of privacy, however, is misplaced. First, what occurred were interrogations, not Fourth Amendment searches, and Defendant offers no legal support otherwise. To the extent that SA Hale's entrance into John's hospital room can be considered a search, however, the Court finds that Defendant did not have a reasonable expectation of privacy. In a not dissimilar case, *United States v. George*, the Ninth Circuit Court of Appeals found that a patient admitted to the hospital did not have a reasonable expectation of privacy in his hospital room. 987 F.2d 1428 (9th Cir. 1993). In *George*, a suspect was involuntarily admitted to the hospital while suffering a drug overdose. *Id.* at 1429. Suspecting that the suspect had swallowed balloons of heroin, the police searched the suspects bed pan and seized the results. *Id.*

---

[9] Defendant does not attempt to disambiguate Defendant's subjective expectations of privacy from society's objective expectations.

[10] Defendant offers no other facts that he considers relevant and does not attempt to distinguish the March 21 "intrusion" from the March 23 "intrusion." Accordingly, except where noted, the Court considers them together.

The court held that the suspect did not have an objectively reasonable expectation of privacy because he was admitted to the hospital involuntarily and under police supervision. *Id.* at 1432. Therefore, the officers did not commit an unreasonable search and seizure when they entered the suspect's room, searched his bedpan, and seized the results. *Id.* Although the suspect in *George* was already under arrest when the "intrusion" occurred, unlike Defendant here, the distinction is not material because Defendant was under similarly heightened supervision.

Furthermore, even if Defendant someone had both a subjective and objectively reasonable expectation of privacy in his commercial, albeit "private," hospital room,[11] the Court cannot find a Fourth Amendment violation where Defendant consents to SA Hale's presence. Here, the government has introduced evidence demonstrating that Defendant consented to both interviews, thereby legitimizing SA Hale's presence in his hospital room. Defendant has produced no evidence suggesting that he ever asked SA Hale to leave or otherwise revoked consent. Consequently, the Court concludes that the two interviews subject to Defendant's suppression motion did not violate Defendant's Fourth Amendment rights. Accordingly, the Court denies Defendant's Motion to Suppress with respect to a Fourth Amendment violation.

### B.   *Miranda* Waiver

Defendant alleges that the circumstances surrounding Defendant's statements indicate that Defendant was not competent to waive either his right to counsel or his right to remain silent. (Doc. 150 at 7–8). Notably, Defendant does not appear to dispute that he was properly *Mirandized* before both interviews, acknowledged that he understood his rights, did not request an attorney,[12] and was not coerced into speaking by SA Hale. (*See*

---

[11] Although, the Court notes that hospital employees undisputedly came and went from Defendant's hospital room freely.

[12] Defendant alleges that Defendant's family informed hospital security of their intent to procure an attorney for Defendant. Defendant further alleges that hospital staff informed the FBI of this prior to the interviews. To the extent that Defendant alludes to the possibility that these events somehow effectively invoked Defendant's right to an attorney, Defendant has not submitted any legal authority suggesting that, at the relevant time, Defendant's right to an attorney could be invoked by anyone other than himself.

- 13 -

1  Doc. 150). Rather than disputing what happened during the interrogation, itself,
2  Defendant generally relies on two competency evaluations performed by Dr. Barry
3  Morenz and Dr. Marissa Menchola to argue that Defendant did not have capacity to
4  consent. (Doc. 150 at 4–5, 8).

### 1. Dr. Morenz's Expert Opinion

At the suppression hearing, Dr. Morenz testified that Defendant did not have the capacity to knowingly and intelligently consent to being interviewed by SA Hale. Dr. Morenz based his post hac diagnosis "on the totality of the circumstances," including the possible effects of medications (morphine and Ativan), Defendant's emotional state, and Defendant's overall development and capacity. Dr. Morenz, however, admitted that his interviews with Defendant occurred many months after the two March interviews and that Dr. Morenz's knowledge of the March interviews came primarily from Defendant's statements to Dr. Morenz and secondarily from a review of various police and medical records. Additionally, Dr. Morenz admitted that although Defendant had been prescribed morphine and Ativan, Dr. Morenz had no knowledge of what dosage, if any, Defendant had consumed at the time of either interview. Thus, Dr. Morenz admitted that he could not say with medical certainty to what extent medications may have affected Defendant's competency. Although the Court finds Dr. Morenz eminently qualified, here Dr. Morenz's opinion lacks meaningful foundation and was formed too remotely to be probative. Consequently, the Court ascribes limited credibility to Dr. Morenz's opinion of Defendant's competency at the March 21 and 23, 2012 interviews.

### 2. Dr. Menchola's Expert Opinion

At the suppression hearing, Dr. Menchola expressed a similar post hac diagnosis of Defendant's lack of competency. Dr. Menchola, a neuropsychologist, based her opinion on tests she administered that revealed Defendant's significant difficulty using

---

Indeed, the opposite is true. *Moran v. Burbine*, 475 U.S. 412 (1986) (holding that Sixth Amendment right to counsel did not attach to a murder suspect who had not yet been formally charged even though his sister had retained counsel for him and the suspect had been placed in custodial interrogation).

language to express ideas and for abstract or concrete reasoning. Dr. Menchola, however, indicated that because the tests she administered to Defendant had not been normalized[13] for Defendant's specific cultural and ethnic characteristics, Defendant's results did not display a typical degree of certainty. With regard to Defendant's test results, Dr. Menchola specifically explained that during her tests, Defendant expressed understanding of his right to remain silent, but was not able to articulate what, exactly, the implications of waiving the right could be. In contrast to Defendant's low ability to verbally express himself, Dr. Menchola admitted that Defendant's verbal comprehension was "grossly normal" and "mostly normal." Additionally, Dr. Menchola admitted that her examination occurred almost exactly one year from the date of the two March interviews and that, when forming her opinion, she relied exclusively on Defendant's statements to her; she did not consult any materials related to the investigation or the two interviews at issue. Although the Court finds Dr. Menchola eminently qualified, here Dr. Menchola's opinion lacks meaningful foundation and was formed too remotely to be probative. Consequently, the Court ascribes limited credibility to Dr. Menchola's opinion of Defendant's competency at the March 21 and 23, 2012 interviews.

### 3.     Legal Standard

In determining the voluntariness of Defendant's statements, the Court must determine "whether, under all of the circumstances—including [Defendant's] age, intellectual disability, and lack of sophistication, and the interrogation techniques used—there was coercive police action which overbore [Defendant's] will and rendered his confession involuntary." *United States v. Preston*, --- F.3d ---, ---, 2014 WL 1876269, at *9 (9th Cir. May 12, 2014) (en banc). In evaluating the voluntariness of Defendant's confession, it is not necessary to first conclude that the government's conduct was coercive before examining Defendant's individual characteristics. *Id.* at ---, 2014 WL

---

[13] Dr. Menchola explained that "normalization"—e.g. identifying a baseline—is achieved by administering the test to a statistically significant number of test-takers exhibiting similar cultural and ethnic characteristics and comparing the results. Here, Dr. Menchola did not have any tests specifically normalized for Defendant's White Mountain Apache characteristic.

1876269, *8–9 (overruling *Derrick v. Peterson*, 924 F.2d 813 (9th Cir. 1991), *Amaya-Ruiz v. Stewart*, 121 F.3d 486 (9th Cir. 1997), *United States v. Chischilly*, 30 F.3d 1144 (9th Cir. 1994)).

> Although sometimes framed as an issue of 'psychological fact,' the dispositive question of the voluntariness of a confession has always had a uniquely legal dimension." *Miller*, 474 U.S. at 115–16 (internal citation omitted). "The notion of 'voluntariness' is itself an amphibian" and "purports at once to describe an internal psychic state and to characterize that state for legal purposes." *Culombe*, 367 U.S. at 604–05. Ultimately, "the admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to this suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne." *Miller*, 474 U.S. at 116. Thus, the voluntariness determination "reflects deep, even if inarticulate, feelings of our society" about the acceptability of the imposition of certain interrogation methods on a particular person. *Haley*, 332 U.S. at 603 (Frankfurter, J., concurring). This "focus on the constitutional acceptability of the government conduct rather than merely on the defendant's state of mind at the time of the confession requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles." *Wolf*, 813 F.2d at 974 (citation and internal quotation marks omitted).

*Preston*, --- F.3d at ---, 2014 WL 1876269, at *9.

### 4. Analysis

Here, Defendant adduces no evidence suggesting that SA Hale used coercive interrogation tactics such that Defendant's statements were anything but voluntary. Rather, Defendant relies solely on his two expert's opinions that Defendant's individual characteristics demonstrating a reduced mental capacity simply precluded any voluntary waiver of Defendant's right to remain silent. In *Preston*, however, the Ninth Circuit very recently made it abundantly clear that courts consider a defendant's reduced mental capacity "because it [may] render[ ] him more susceptible to subtle forms of coercion." --- F.3d at ---, 2014 WL 1876269, at *10 (citing *N. Mariana Islands v. Mendiola*, 976 F.2d 475, 485 (9th Cir. 1993), overruled on other grounds by *George v. Camacho*, 119 F.3d 1393 (9th Cir. 1997) (en banc)).

1 With regard to the March 21 and 23 interviews, the Court finds that SA Hale's testimony (which the Court finds fully credible) and the tape and transcript of the March 23 interview do not indicate that SA Hale used any inherently coercive interrogation techniques when interviewing Defendant. SA Hale spent approximately 45 minutes conversing with Defendant prior to the March 21 interview in order to establish Defendant's ability to understand and answer questions. SA Hale stated that Defendant appeared to have greater competency and understanding than many of the tribal members he has interviewed in the past. During the interviews, SA Hale asked simple and often open-ended questions. SA Hale used simple language, went slowly, explained questions and concepts, and kept the interviews relatively short. SA Hale did not volunteer incriminating details of the crime, press for answers when Defendant expressed a lack of knowledge, or persistently rephrase questions when Defendant provided a non-inculpatory answer. SA Hale repeatedly informed Defendant that he did not have to answer questions. At the March 21 interview, SA Hale did not demand that Defendant sign a written waiver after Defendant inquired whether Defendant could sign the written waiver later. In sum, nothing in the record suggests that SA Hale sought to take advantage of Defendant's weakened condition.

Turning to Defendant, SA Hale testified that during both interviews, Defendant was coherent, generally unemotional, and responsive to the agents' questions, answered without hesitation, and did not appear impaired by medications. Defendant had previously had numerous visitors to his hospital room and had a pile of written notes stacked next to his bedside, indicating that Defendant had been communicating with others. Defendant communicated with both head nods and shaking, written notes, and, at the March 23 interview, whispers. Defendant did not ask to end the interviews despite being advised by SA Hale that he could. Defendant expressed understanding of his rights and, furthermore, the record establishes that Defendant was no stranger to law enforcement and had been read *Miranda* rights on many previous occasions. During the March 21 interview, Defendant specifically asked SA Hale to return once Defendant was

1 physically able to express himself verbally. Additionally, Defendant expressed his will to
2 sign the March 21 written waiver at a later date, but nonetheless chose to continue
3 speaking with SA Hale. Defendant also volunteered material details—such as the fact
4 that the murder weapon was scissors—without prompting or suggestion from SA Hale.
5 Additionally, at the end of the March 21 interview, Defendant even specifically asked SA
6 Hale for the whereabouts of Defendant's cellphone. To facilitate the return of his
7 cellphone, Defendant drew a detailed sketch of his phone from memory, including a
8 unique identifying mark. Displaying recollection of the previous interview, on March 23
9 Defendant again inquired about his cellphone.

10 Although Defendant was in the hospital, medicated (to an unknown extent), and
11 recovering from trauma and pain, the Ninth Circuit has held that a defendant can
12 voluntarily waive his *Miranda* rights even when he is "in the hospital, on medication, and
13 in pain." *George*, 987 F.2d at 1430. Moreover, Courts have consistently found a
14 defendant's statements voluntary in circumstances more questionable than these. *See,*
15 *e.g.*, *California v. Beheler*, 463 U.S. 1121, 1124–25 (1982) (statements upheld where
16 defendant was interviewed while intoxicated and emotionally distraught); *United States*
17 *v. Miller*, 84 F.2d 1028, 1032 (9th Cir. 1993) (finding that "mere emotionalism and
18 confusion" do not render waiver involuntary); *United States v. Martin*, 781 F.2d 671,
19 673–74 (9th Cir. 1985) (upholding statements where the defendant was in pain and under
20 the influence of Demerol and pain killers when interviewed); *United States v. Rodriguez-*
21 *Rodriguez*, 393 F.3d 849, 55 (9th Cir. 2005) (statements voluntary where defendant was
22 suffering from mild to moderate heroin withdrawal); *United States v. Lewis*, 833 F.2d
23 1380, 1382–83 (9th Cir. 1987) (upholding interview of the defendant in the prison
24 hospital one day after the defendant underwent surgery).

25 Considered all together, the various factors here (including Defendant's weakened
26 mental and emotional state) do not suggest that SA Hale overbore Defendant's will
27 during either the March 21 or March 23 interviews. The Court finds that Defendant had
28 the necessary competency to, and did, in fact, knowingly and voluntarily waive his

*Miranda* rights. Accordingly, the Court denies Defendant's Motion to Suppress with respect to a Fifth and Sixth Amendment *Miranda* violation.

## V. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant Willard John's two Motions to Dismiss the Indictments (Docs. 149, 151) and one Motion to Suppress Defendant's Statements (Doc. 150) are DENIED.

Dated this 24th day of June, 2014.

James A. Teilborg
Senior United States District Judge